BETSY C. MANIFOLD (182450)
Manifold@whafh.com
RACHELE R. BYRD (190634)
byrd@whafh.com
ALEX J. TRAMONTANO (276666)
trakontano@whafh.com
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NATHAN CAPLETON, derivatively on behalf of OWLET, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>KURT WORKMAN, LAURA J. DURR, AMY N. MCCULLOUGH, MELISSA A. GONZALES, ZANE BURKE, JOHN C. KIM, LIOR SUSAN, MARC F. STOLL, KEN SUSLOW, MICHAEL ABOTT, and KATE SCOLNICK,<br><br>Defendants,<br><br>and<br><br>OWLET, INC.,<br><br>Nominal Defendant | No. Case Number ____________<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Nathan Capleton ("Plaintiff"), by his undersigned attorneys, derivatively on behalf of Nominal Defendant Owlet Inc. ("Owlet" or the "Company"), files this Shareholder Derivative Complaint against Kurt Workman, Laura J. Durr, Amy N. McCullough, Melissa A. Gonzales, Zane Burke, John C. Kim, Lior Susan, Marc F. Stoll, Ken Suslow, Michael Abott, and Kate Scolnick (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Owlet.

Plaintiff alleges the following against the Individual Defendants based upon personal knowledge as to himself and his acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of Defendants' publicly available documents, filings with the United States Securities and Exchange Commission ("SEC"), press releases published by and regarding Owlet, legal filings, news reports, securities analysts' reports about the Company, the pleadings in the consolidated securities class action *Butala v. Owlet, Inc., et al.,* Case No. 2:21-cv-09016-FLA-SSC (C.D. Cal.) (the Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought in the right, and for the benefit, of Owlet against certain of its officers and directors seeking to remedy Defendants' breaches of their fiduciary duties between at least March 31, 2021 and August 5, 2024, inclusive (the "Relevant Period"), and have caused, and continue to cause, substantial harm to Owlet and its shareholders, including monetary losses and damages to Owlet's reputation and goodwill.

2. Sandbridge Acquisition Corporation ("Sanbridge") was as a special purpose acquisition company ("SPAC"). A SPAC is a publicly traded company without commercial operations formed for the sole purpose of raising capital through

an initial public offering ("IPO") earmarked to fund a business combination. This process allows the private company to go public without following the traditional initial public offering (IPO) route.

3. On July 15, 2021, Sandbridge completed a merger with Owlet Baby Care Inc. (the "Merger") in accordance with a merger proxy statement submitted to the SEC on June 21, 2021 (the "Proxy Statement"). A preliminary proxy was included in and became part of a Registration Statement filed on Form S-4 with the SEC on March 31, 2021 (the "Registration Statement").

4. Owlet develops and sells baby monitoring products, with its flagship product being the Owlet Smart Sock. This device tracks a baby's heart rate, oxygen levels, and sleep patterns through a sock worn during sleep. The data is accessible to parents via a smartphone app, offering real-time monitoring of vital signs. The Smart Sock is designed to help prevent Sudden Infant Death Syndrome ("SIDS"), the leading cause of infant mortality, and monitor respiratory issues, which are the primary reason for pediatric emergency room visits.

5. For five years prior to the Merger, the FDA informed Owlet that the Smart Sock is as a medical "device" under the Food, Drug, and Cosmetic Act, 21 U.S.C. §(h) (the "Act").

6. Under the Act, a company is required to obtain FDA authorization before marketing or selling a medical device. However, despite clear communications from the FDA indicating that the Smart Sock is as a medical device, the Company continued to market and sell the product in violation of FDA regulations. Furthermore, both the Registration Statement and the Proxy Statement, issued to gain shareholder approval for the Merger, contained several false and misleading statements claiming that the Smart Sock was not a medical device and failed to disclose the Company's interactions with the FDA.

7. On October 4, 2021, the Company disclosed that it had received a

Warning Letter from the FDA on October 1, 2021 (the "Warning Letter"). The letter stated that the Smart Sock is as a medical device and instructed the Company to immediately stop all marketing and sales of the product.

8. Following this news, Owlet's stock price dropped by 23% in a single day, closing at $4.19 per share on October 4, 2021.

9. As a consequence of these developments, a Securities Class Action was initiated against the Company and several of its executive officers, subjecting the Company to substantial class-wide liability. On August 5, 2024, the court overseeing the Securities Class Action issued a ruling denying the defendants' motion to dismiss. The court concluded, among other things, that the plaintiff had "allege[d] sufficiently" that the individual defendants "misrepresented they never received written communication from the FDA alleging non-compliance."

10. Furthermore, due to the breaches of fiduciary duty by the Individual Defendants, most of whom are current directors of the Company, the substantial risk of their liability in this derivative action and the Securities Class Action, and the fact that the Individual Defendants are closely tied to one another through longstanding business and personal relationships, they lack the necessary disinterestedness and independence to fairly consider a demand to initiate litigation against themselves and the other Individual Defendants on behalf of the Company. Therefore, the Plaintiff did not make a demand on the Board, as doing so would have been futile and pointless, as detailed further in this document.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and Rule 14a-9 (17 C.F.R.§240.142-9) promulgated thereunder by the SEC.

12. This Court has supplemental jurisdiction over Plaintiff's state law claims

pursuant to 28 U.S.C. §1367(a).

13. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

14. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

15. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and is headquartered in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

16. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Defendants have conducted business in this District, and a substantial portion of the transaction and wrongs complained of herein occurred in this District.

## PARTIES

### Plaintiff

17. Plaintiff is, and has been at all relevant times, a shareholder of Owlet.

### Nominal Defendant

18. Nominal Defendant Owlet is incorporated under the laws of Delaware with its principal executive offices located at 3300 North Ashton Boulevard, Suite 300, Lehi, Utah, 90404. Owlet's common stock is traded on the New York Stock Exchange ("NYSE") under the ticker symbol "OWLT".

### Individual Defendants

19. Defendant Kurt Workman ("Workman"), a co-founder of Owlet in 2012, has served on the Board since its inception and currently holds the role of President

and Chief Executive Officer ("CEO"). Based on the Company's public filings, Workman earned $4,681,017 in compensation from the Company in 2022. As of June 27, 2024, he beneficially owns 556,306 shares of Owlet common stock, valued at $2,152,904, which represents 5.97% of the Company's total outstanding shares. Workman is also a named defendant in the Securities Class Action.

20. Defendant Laura J. Durr ("Durr") has been a member of the Board since February 2021 and currently serves as the Chair of the Audit Committee. According to the Company's public filings, Defendant Durr received $286,783 in compensation from the Company in 2023. As of June 27, 2024, Defendant Durr beneficially owns 47,111 shares of Owlet common stock, valued at $182,319.

21. Defendant Amy N. McCullough ("McCullough") has been a member of the Board since April 2021 and currently serves as a member of the Audit Committee.

22. Defendant Melissa A. Gonzales ("Gonzales") has been a member of the Board since July 2023. According to the Company's public filings, Defendant Gonzales received $175,935 in compensation from the Company in 2023. As of June 27, 2024, Defendant Gonzales beneficially owns 34,347 shares of Owlet common stock, valued at $132,922.

23. Defendant Zane Burke ("Burke") has been a member of the Board since March 2021. According to the Company's public filings, Defendant Burke received $254,283 in compensation from the Company in 2023. As of June 27, 2024, Defendant Burke beneficially owns 54,444 shares of Owlet common stock, valued at $210,698.

24. Defendant John C. Kim ("Kim") has been a member of the Board since April 2021 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Kim received $254,283 in compensation from the Company in 2023. As of June 27, 2024, Defendant Kim beneficially owns 332,227 shares of Owlet common stock, valued at $1,285,718, representing 3.54% of the Company's total outstanding shares.

25. Defendant Lior Susan ("Susan") has been a member of the Board since July 2015 and currently serves as its Chairman. As of June 27, 2024, Defendant Susan beneficially owns 12,224,955 shares of Owlet common stock, valued at $47,310,575, representing 63.38% of the Company's total outstanding shares.

26. Defendant Marc F. Stoll ("Stoll") has served as a member of the Board since August 2023.

27. Defendant Ken Suslow ("Suslow") served as the CEO and Chairman of the Board of Sandbridge prior to the Merger and was a member of the Board of Owlet from the time of the Merger until March 2022.

28. Defendant Michael Abott ("Abott") served as Owlet's President and as a member of its Board from December 2019 until September 2022. Prior to that, Defendant Abott held the roles of Chief Financial Officer ("CFO") and Chief Operating Officer from February 2018 to December 2019. According to the Company's public filings, Defendant Abott received $3,759,903 in compensation from the Company in 2022.

29. Defendant Kate Scolnick ("Scolnick") served as the Company's Chief Financial Officer ("CFO") from July 2021 until July 2024. According to the Company's public filings, Defendant Scolnick received $1,668,488 in compensation from the Company in 2022. As of June 27, 2024, Defendant Scolnick beneficially owns 25,786 shares of Owlet common stock, valued at $99,791.

**Non-Party Confidential Witnesses**

30. This action is based on Plaintiff's review, by counsel, of an extensive record of public documents as well as the Amended Consolidated Class Action Complaint (the "Amended Complaint") in the Securities Class Action, which contains detailed allegations based on interviews with four former Owlet employees (referred to herein as Fes 1-4) who provided information to plaintiffs' counsel in the Securities Class Action supporting the allegations in that case. These former employees provided

information on a confidential basis and were described in the Amended Complaint with sufficient detail to establish their reliability and personal knowledge.

31. FE 1 worked at Owlet as a Chief Brand Officer between February 2019 and January 2021.

32. FE 2 worked at Owlet as a Product Marketing Manager between September 2020 and April 2021.

33. FE 3 worked at Owlet as a Senior Product Marketing Manager between July 2021 and March 2022.

34. FE 4 worked at Owlet as a member of the Company's Product Team between April 2021 and June 2022.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

35. By reason of their positions as officers, directors, and/or fiduciaries of Owlet and because of their ability to control the business and corporate affairs of Owlet, the Individual Defendants owed Owlet and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care.

36. The Individual Defendants were and are required to use their utmost ability to control and manage Owlet in a fair, just, honest, and equitable manner.

37. The Individual Defendants were and are required to act in furtherance of the best interests of Owlet and its shareholders to benefit all shareholders equitably.

38. Each director and officer of the Company owes Owlet and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company.

39. As fiduciaries of Owlet, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein because of their position and authority.

40. The officers and directors of Owlet were and are required to exercise reasonable and prudent supervision over the management, policies, controls, and

operations of the Company to discharge their duties.

41. Each Individual Defendants under their position as officers of Owlet, owed to the Company and its shareholders the highest fiduciary duties of loyalty, good faith, care, and diligence in the management and administration of the affairs of the Company.

42. As Owlet's directors and officers, the Individual Defendants knowingly acted with reckless disregard for their obligations as fiduciaries because their conduct posed a significant risk of harm to the Company.

43. The Individual Defendants had a duty to prevent and correct the dissemination of erroneous, misleading, and deceitful information concerning, inter alia, the Company's financial condition, business operations, management, performance, growth, earnings, and business prospects. Moreover, as senior officers of a publicly traded company whose common stock was registered with the SEC, pursuant to the Exchange Act, the Individual Defendants had a duty to act in the best interest of the Company.

44. As fiduciaries, the Individual Defendants had a duty to disclose in its regulatory filings with the SEC all events described in this Complaint that it failed to disclose so that the Company's valuation and the common stock price would be based on accurate information and to preclude deceptive practices in the market.

45. The Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company to discharge their duties. Among other things, the Individual Defendants were required to:

a) Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New York, the United States, and pursuant to Owlet's Code of Conduct and internal guidelines;

b) Conduct the affairs of the Company in an efficient, businesslike manner

to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c) Remain informed as to how Owlet conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make a reasonable inquiry in connection and in addition to that and to take steps to correct such conditions or practices;

d) Establish and maintain systematic, accurate records and reports of the business and internal affairs of Owlet and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause an independent investigation to be made of, said reports and records;

e) Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Owlet's operations would comply with all laws and Owlet's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate.

f) Exercise reasonable control and supervision over the Company's officers and employee's public statements and any other reports or information that the Company was required by law to disseminate.

g) Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

h) Examine and evaluate any reports of examinations, audits, or additional financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

46. Each of the Individual Defendants also bore a duty of loyalty to Owlet and its shareholders, mandating the prioritization of the Company's and its shareholders' interests above their own in the management of the Company's affairs

and prohibiting the use of their position, influence, or insight into the Company's operations for personal gain.

47. Each of the Individual Defendants also bore a duty of loyalty to Owlet and its shareholders, mandating the prioritization of the Company's and its shareholders' interests above their own in the management of the Company's affairs and prohibiting the use of their position, influence, or insight into the Company's operations for personal gain.

48. During the pertinent times, the Individual Defendants served as agents for each other and for Owlet, always operating within the parameters of their agency.

49. The Individual Defendants, through their advisory, executive, managerial, and directorial roles within Owlet, were privy to detrimental, confidential information concerning the Company.

50. The Individual Defendants, through their advisory, executive, managerial, and directorial roles within Owlet, were privy to detrimental, confidential information concerning the Company.

51. Due to their positions of influence and authority, the Individual Defendants had the capability to, and indeed did, directly or indirectly control the improper actions detailed in this complaint, as well as the content of the various public declarations made by Owlet.

52. Due to their positions of influence and authority, the Individual Defendants had the capability to, and indeed did, directly or indirectly control the improper actions detailed in this complaint, as well as the content of the various public declarations made by Owlet.

53. Due to their positions of influence and authority, the Individual Defendants had the capability to, and indeed did, directly or indirectly control the improper actions detailed in this complaint, as well as the content of the various public declarations made by Owlet.

## OWLET'S CODE OF CONDUCT

54. The Individual Defendants, like all employees, directors, and officers of the Company, are required to comply with Owlet's Code of Business Conduct and Ethics (the "Code of Conduct"). Owlet's Code of Conduct opens with a pledge to uphold "the highest standards of business ethics."

55. The Code of Conduct apples to all the Company's "directors, officers, and other employees," and violations of the Code of Conduct will lead to "appropriate discipline, which may include, for an employee, termination of employment or, for a director, a request that such director resign from the Board of Directors of the Company."

56. In a section titled "**COMPANY RECORDS**," the Code of Conduct states:

> Accurate and reliable records are crucial to our business. Our records are the basis of our earnings statements, financial reports, regulatory submissions and many other aspects of our business and guide our business decision-making and strategic planning. Company records include, without limitation, financial records, personnel records, supplier lists, customer lists, records relating to our locations, facilities, products, technology and product development, customer collaborations, manufacturing and regulatory submissions and all other records maintained in the ordinary course of our business.
>
> All Company records must be complete, accurate and reliable in all material respects. Each employee and director must follow any formal document retention policy of the Company with respect to Company records within such employee's or director's control. Please contact your supervisor or an Authorized Officer to obtain a copy of any such policy or with any questions concerning any such policy.

57. With respect to Company assets, the Code of Conduct states that "[e]mployees should protect the Company's assets and provide for their efficient use for legitimate business purposes only."

58. In a section titled "**ACCURACY OF FINANCIAL REPORTS AND OTHER PUBLIC COMMUNICATIONS**," the Code of Conduct states:

> As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability. The Company's principal financial officers and other employees working in the Company's finance department or otherwise involved in the Company's financial statements and financial reporting have a special responsibility to provide that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts."

59. In a section titled "**COMPLIANCE WITH LAWS AND REGULATIONS,"** the Code of Conduct states:

> Each employee and director has an obligation to comply with all laws, rules and regulations applicable to the Company's operations. These include, without limitation, laws covering bribery and kickbacks, the development, testing, manufacture, marketing and sale of our products, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal

political contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. You are expected to understand and comply with all laws, rules and regulations that apply to your job position. If any doubt exists about whether a course of action is lawful, you should seek advice from your supervisor or an Authorized Officer.

60. In a subsection titled "***Public Communications Generally***," the Code of Conduct states:

> The Company places a high value on its credibility and reputation in the community. What is written or said about the Company in the news media and investment community directly impacts our reputation, positively or negatively. Our policy is to provide timely, accurate and complete information in response to public requests (from media, analysts, etc.), consistent with our obligations to maintain the 9 confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data.

**<u>OWLET'S AUDIT COMMITTEE CHARTER</u>**

61. In addition, under the Audit Committee Charter in effect during relevant times, Defendants Durr, McCullough, and Kim ("Audit Committee Defendants") owed specific further duties to Owlet. The Audit Committee, pursuant to its Charter, is responsible for assisting the Board in overseeing the financial reporting processes on behalf of the Board and reporting the results of its activities to the Board and preparation and certification of the Company's financial statements to guarantee the independent auditors' report, or to guarantee other disclosures by the Company.

62. Pursuant to Owlet's Audit Committee Charter, the purpose of the Audit Committee is to assist the Board in its oversight of: "(i) The quality and integrity of

the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications, performance and independence; and (iv) the performance of the Company's internal audit functions and independent auditor."

63. In a subsection titled "***Form 10-K Review,***" the Audit Committee Charter states:

> The Committee must review and discuss the annual audited financial statements with management and with the independent auditor including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" for inclusion in the Company's Annual Report on Form 10-K. The Committee is responsible for recommending to the Board whether or not to include financial statements in the Company's annual report.

64. In a subsection titled "***Form 10-Q Review,***" the Audit Committee states that the Audit Committee "must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" for inclusion in the Company's Quarterly Reports on Form 10-Q."

65. In a subsection titled "***Risk Assessment and Management***," the Audit Committee Charter states:

> The Committee must oversee enterprise risk management, including the management of financial risks; review and discuss the Company's guidelines and policies with respect to risk assessment and risk management; and discuss with management the steps management has taken to monitor and control these exposures. The Committee must discuss with management and the independent auditors correspondence with regulators or governmental agencies that raise material issues regarding the Company's financial

statements or accounting policies.

66. With respect to internal controls over financial reporting, the Audit Committee Charter states:

> The Committee must review and discuss with management, the internal auditor (or other personnel responsible for the internal audit function), once established and the independent auditor, the adequacy and effectiveness of the Company's internal control over financial reporting ("ICFR"), the adequacy of the Company's disclosures about changes in ICFR and any steps management has taken to address material deficiencies in ICFR. The Committee must review and discuss with management and the independent auditor management's report on ICFR and the independent auditor's attestation report on the Company's ICFR for purposes of the Company's Annual Report on form 10-K, to the extent such reports are required.

67. The Audit Committee Charter further states that the Audit Committee is "directly responsible for the oversight of internal audit function and must review any reports prepared by the internal audit function, the budget and staffing of internal audit function, and the annual internal audit plan."

68. With respect to the Company's Code of Conduct, the Audit Committee Charter states that the Audit Committee "must monitor compliance with Company's Code of Business Conduct and Ethics and investigate any matters pertaining to the integrity of management or adherence to standards of business conduct as required in Company policies."

69. The Individual Defendants, because of their positions of control and authority as officers and/or directors of Owlet, were able to and did directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal action. As a result, and in addition to the damages the Company

already incurred, Owlet has needlessly expended and will continue to needlessly expend, significant sums of money.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

70. In carrying out the wrongful acts alleged herein, the Individual Defendants have engaged in or participated in a common course of conduct and acted in coordination, conspiring with one another to further their misconduct. They caused the Company to conceal the true facts, as alleged throughout this document. Additionally, the Individual Defendants aided, abetted, and/or assisted each other in breaching their respective duties.

71. The intent and outcome of the conspiracy, shared enterprise, and coordinated actions were, among other things, to facilitate and hide the Individual Defendants' violations of the law, including breaches of fiduciary duty and unjust enrichment.

72. The Individual Defendants carried out their conspiracy, common enterprise, and/or coordinated actions by causing the Company, either intentionally, recklessly, or negligently, to hide material facts, fail to correct misrepresentations, and violate applicable laws.

73. To advance this plan, conspiracy, and course of conduct, the Individual Defendants, both together and individually, took the actions outlined in this document. Since these actions were executed under the authority of the Board, each of the Individual Defendants who are directors of Owlet played a direct, essential, and significant role in the conspiracy, common enterprise, and/or coordinated conduct complained of herein.

74. Each of the Individual Defendants aided, abetted, and provided significant assistance in the misconduct alleged in this complaint. In doing so, each Defendant acted with actual or implied knowledge of the primary wrongdoing, either directly participated in or played a substantial role in facilitating the misconduct, and

was, or should have been, aware of their overall contribution to and support of the wrongful actions.

75. Throughout the relevant period, each of the Individual Defendants acted as an agent of the other Individual Defendants and of Owlet, consistently operating within the scope and authority of that agency.

## FACTUAL BACKGROUND

76. As mentioned above, Sandbridge was a SPAC. Shareholders and management of a SPAC can only profit through ownership of common stock if a merger is completed within the designated time frame. If the merger is not finalized within the stipulated period, the SPAC is dissolved, and the funds held in the trust are returned to investors. In such cases, the founders and management do not receive salaries, fees, or any other cash compensation. As a result, the founders and management team of a SPAC have strong incentives to complete a merger within the specified timeframe.

77. SPAC founders cannot select a target company for merger or acquisition until after the SPAC's IPO is finalized. The proceeds from the IPO are held in a trust account while the SPAC's management team searches for a target to complete the merger within a designated timeframe. Once a target is identified, shareholders of the SPAC vote on whether to approve or reject the merger. To make an informed decision, shareholders depend on a merger proxy statement, which provides the target company's financial information and outlines the terms of the proposed merger.

78. Sandbridge had a 24-month window from the date of its Initial Public Offering ("IPO") on September 14, 2020, to complete a merger with a target company.

79. On July 15, 2021, Sandbridge completed its merger with Owlet, as outlined in a merger proxy statement filed with the SEC on June 21, 2021.

80. Owlet develops and sells baby monitoring products, including its flagship product, the Owlet Smart Sock. This device tracks a baby's heart rate,

oxygen levels, and sleep patterns through a wearable sock during sleep. Parents can access the data collected by the Smart Sock via a smartphone app. The Smart Sock is designed to offer parents real-time monitoring of vital signs to help prevent Sudden Infant Death Syndrome (SIDS), the leading cause of infant death, and respiratory issues, which are the primary reason for pediatric emergency room visits.

81. For five years prior to the Merger, the FDA informed Owlet that the Smart Sock qualifies as a medical "device" under the Act, which defines a device as:[1]

> An instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is . . . ***intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease***, in man or other animals, or intended to affect the structure or any function of the body of man or other animals.

82. A prototype of the Smart Sock was first introduced at the International Business Model Competition ("IBMC") in May 2013 by Defendant Workman and others. During the presentation, Defendant Workman acknowledged that the Smart Sock is a medical device, explaining that it is "a Class II device . . . because it's sounding an alarm. So an alarm means that we are giving advice to parents. We are saying, 'hey, there's something going on here.'" He further stated that the Smart Sock's classification as a medical device was based on precedent, noting that "pulse oximetry has been around [and] there's so many devices already out there, predicate-wise, that's just how it is." Workman explicitly recognized that "alarm plus pulse oximetry means that you need FDA clearance."

83. In an attempt to avoid the need for FDA approval, Defendant Workman proposed introducing a version of the product without an alarm first. He stated that

[1] Emphases are added unless otherwise noted.

his team planned to "launch[] . . . the non-alarm health tracking version that doesn't need FDA [clearance] to lower risk" and then "seven months later, launch with our flagship product that we know will hit." During the IBMC, a participant sought clarification on this strategy, asking if the team was "using this health monitoring product as a bridge to . . . your class II device, and launch the product with the alarm." Defendant Workman confirmed, replying, "Yeah, we'll start with [the non-alarm version] and seven months later we'll launch our flagship product."

84. On August 26, 2013, Owlet issued a press release introducing the non-alarm version of its Smart Sock. The press release acknowledged that the upcoming alarm and notification features would require FDA clearance, stating that "[t]he Owlet Team is currently going through the FDA process to add an alarm, along with other features, to the next version of the product" which will take the Smart Sock "to a whole new level, notifying parents of drops in heart rate or oxygen levels, and helping to prevent emergencies."

85. On January 20, 2015, the FDA issued draft guidance *titled General Wellness: Policy for Low Risk Devices*, which stated that the FDA no longer "intend[ed] to examine low-risk general wellness products . . . to determine whether they are devices within the meaning of section 201(h) of the [Act] . . . or, if they are devices whether they comply with the [ ] Act's regulatory requirements for devices."

86. In response to this new guidance, Owlet attempted to circumvent FDA regulations applicable to medical devices by launching its Smart Sock with an alarm, marketing it as a "wellness" product.

87. Following the October 2015 launch of its flagship product, the Company continually marketed it as a medical device that monitors a baby's vital signs and alerts parents to potential concerns. Furthermore, Owlet chose Benchmark Electronics, Inc., a manufacturer specializing in medical device production, to manufacture the Smart Sock.

88. According to the Act, the Company was obligated to obtain FDA pre-authorization before selling the Smart Sock. Without FDA approval, a company is barred from introducing a medical device into interstate commerce.

89. Owlet recognized that the Smart Sock, when introduced with an alarm, was classified as a medical device, despite its attempts to market it as a "general wellness product." As early as 2016, the FDA explicitly communicated to Owlet that the Smart Sock was considered a device under the Act.

90. During this period, pediatricians began voicing concerns about products like the Smart Sock. For instance, in January 2017, a group of pediatricians published a letter in the Journal of the American Medical Association, asserting that "[t]here [wa]s no evidence that consumer infant physiologic monitors are life-saving, and there is potential for harm if parents choose to use them." The letter cited Owlet's marketing materials, where Defendant Workman stated, "[w]e can't promise to prevent Sudden Infant Death Syndrome (SIDS) right now . . . but . . . we believe notifying parents when something's wrong maybe can help."

91. In reaction to the negative publicity, Owlet adjusted its marketing to more explicitly present the Smart Sock as a general wellness product. However, in March 2017, the Company launched the second version of the Smart Sock, which still primarily served as a diagnostic tool. While the marketing for this version downplayed the alarm feature, the product introduced a new smartphone application, Connected Care, which continued to use pulse and oxygen level alarms.

92. In 2017, the FDA reiterated to Owlet that the Smart Sock was classified as a medical device. Despite the FDA's clear communication, and the significant risk that Owlet could be instructed to halt sales, the Company ignored these warnings and continued to violate FDA regulations by marketing and selling the Smart Sock without the required FDA approval.

93. FE 1, the former Chief Brand Officer at Owlet, confirmed that the

Company was aware of the FDA's concerns about the marketing of the Smart Sock. FE 1 stated that the Company "knew they had to be careful" in how the product was publicly represented, and management advised employees to market the Smart Sock cautiously "because the FDA had already filed a complaint." FE 1 also indicated that being cautious with the Smart Sock's marketing was "an ongoing, constant discussion at the company."

94. FE 2, a former Product Marketing Manager at Owlet, confirmed that the Company was aware it needed FDA approval and authorization to sell the Smart Sock and, until then, planned to be cautious not to market it as a medical device. FE 2 explained, "that was how we were always instructed," with the directive coming "from the top down." FE 2 stated that this was discussed during quarterly meetings, and it was understood that the Company's ultimate goal was to sell the Smart Sock in hospitals and have it covered by insurance, which would only be possible if the product was classified as a medical device. FE 2 further explained that discussions about securing FDA approval took place even before 2020 during monthly business reviews with Defendants Abbott and Workman. FE 2 also mentioned that Defendant Workman reiterated during Marketing Team and Company-wide meetings that, based on communications with the FDA, the Company would need authorization to market and sell the Smart Sock with the alarm feature.

95. FE 3, a former Senior Product Marketing Manager at Owlet, recalled being informed by two senior leaders that the Company was shifting its marketing strategy for the Smart Sock from focusing on child safety to emphasizing parental peace of mind. FE 3 was directly involved in changing the marketing language for the Smart Sock, moving away from "safety" and toward "peace of mind." According to FE 3, after the FDA issued its Warning Letter on October 1, 2021, FE 3 was instructed to remove any references to "monitoring oxygen saturation" across all of the Company's marketing channels, including Owlet's website.

96. FE 4, a former member of the Company's Product Team, further confirmed that the Company understood it needed authorization for the Smart Sock as a medical device before receiving the Warning Letter on October 1, 2021. FE 4 stated that employees were informed that Owlet executives and leadership had been in regular communication with the FDA about the regulatory status of the Smart Sock since the Company’s inception. It was commonly understood within the Company that FDA approval was necessary to sell the Smart Sock as a medical device. According to FE 4, Jim Fidacaro, Owlet's SVP and General Manager of Healthcare, provided updates on the regulatory status and ongoing communications with the FDA during companywide meetings. FE 4 explained that when the FDA’s Warning Letter was received, leadership was not surprised, as they knew the alarm feature classified the Smart Sock as a diagnostic tool, requiring medical device approval.

97. FEs 1, 2, 3, and 4 each independently confirmed that the FDA had warned the Company about how it was marketing the Smart Sock years before the Merger. FE 2 noted that, based on social media coverage, the public perceived the Smart Sock as a medical device. FE 1 stated that the FDA had sent several cautionary letters to the Company regarding the Smart Sock, and that Sandbridge would have likely discovered this during the due diligence process before the Merger. The Proxy Statement confirmed that Sandbridge had access to all relevant information regarding the Smart Sock, stating that on November 7, 2020, the Company provided Sandbridge with data room access, granting full access to Owlet's due diligence documents. The Proxy Statement further stated:

> “Sandbridge has conducted its own independent review and analysis of, and based thereon, has formed an independent judgment concerning, the business, assets, condition, operations and prospects, of the Group Companies and has been furnished with or given access to such documents and information about the Group Companies as necessary to enable it to make an informed decision

with respect to the execution, delivery and performance of the Business Combination Agreement, the ancillary documents thereto and the Transactions."

98. In addition to direct communications with the Company, the FDA also issued industry-wide guidance indicating that the Smart Sock qualified as a medical device. In an article titled *Baby Products with SIDS Prevention Claims*, the FDA clarified that "[a] baby product is considered a medical device if claims to cure, treat, prevent, or reduce a disease or condition are made in the product's labeling, packaging, or advertising." In another article, *Information for Manufacturers of Baby Products*, the FDA warned manufacturers of baby products intended to prevent medical conditions to review their marketing materials "for any direct or implied claims to cure, treat, or prevent a disease or condition, including SIDS," and to immediately "stop marketing" the products without first "receiv[ing] FDA clearance or approval."

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

99. On August 5, 2021, Owlet filed a registration statement on Form S-1 signed by Defendants Workman, Scolnick, Abbott, Burke, Durr, Kim, McCullough, Susan, and Suslow. This registration statement incorporated materially false and misleading statements made by the Individual Defendants in the Proxy Statement. The Proxy Statement was included in and became part of the Registration Statement.

100. The Registration Statement, signed by Defendant Suslow, claimed that the Smart Sock, which generated "the majority of its revenue and expect[ed] to continue to do so for the foreseeable future," was not classified as a medical device. As a result, the Company asserted that it was not required to seek FDA authorization to market the product. The Registration Statement misleadingly portrayed the risk that the FDA might classify the Smart Sock as a medical device as merely hypothetical, despite repeated direct communications from the FDA confirming that it did, in fact, consider the product a medical device. Specifically, the Registration

Statement included the following risk factor:

> "If the U.S. Food and Drug Administration ("FDA") or any other governmental authority were to require marketing authorization for the Owlet Smart Sock, or for any other product that Owlet sells and which Owlet does not believe requires such marketing authorization, Owlet could be required to cease selling or recall the product pending receipt of marketing authorization from the FDA or such other governmental authority, which can be a lengthy and time-consuming process, harm financial results and Owlet may also be subject to regulatory enforcement action."

101. The Registration Statement continued, warning investors that the FDA "***may*** not agree with that conclusion that [the Smart Sock is not a medical device]":

> In response to inquiries from the FDA and regulatory authorities in other jurisdictions regarding the marketing of the Owlet Smart Sock, we have communicated our belief that the Owlet Smart Sock is not a medical device and does not require marketing authorization from the FDA or approval/certification from such other regulatory authorities. However, the FDA and certain regulatory authorities have expressed they may not agree with that conclusion and could require us to obtain marketing authorization (or approval/certification) to continue to sell the product. Obtaining authorization to sell the Owlet Smart Sock as a medical device is a time-consuming and costly process and we may be precluded from selling the Owlet Smart Sock if we are required to obtain marketing authorization. If granted, a marketing authorization could require conditions to sale, for example, a prescription requirement. If the FDA or other regulatory authorities require such marketing authorization (or approval/certification, respectively) for the Owlet Smart Sock, or for any other product that we sell and which we do not believe requires such clearance, approval, certification or marketing authorization, we could be

> required to cease selling or recall the product in the corresponding jurisdiction pending receipt of marketing authorization (or approval/certification), which can be a lengthy and time-consuming process, and we may also be subject to regulatory enforcement action. In addition, we may be required to modify the product's functionality or limit our marketing claims for the product, whether or not we obtain such clearance, approval, certification or marketing authorization. In any such event, our business could be substantially harmed.

102. Despite promoting the Smart Sock's ability to diagnose tachycardia ("SVT"), the most common arrhythmia in children, the Individual Defendants continued to assert that the product was not a medical device:

> Although the Owlet Smart Sock is a consumer product and not a medical device, study investigators were able to observe more than 202 million total hours of anonymized data from 100,949 babies born between February 2017 and February 2019 and monitored by the Owlet Smart Sock. The investigators identified 5,070 total suspected episodes of tachyarrhythmia in 2,508 infants, for a cumulative incidence of 2.5%.
>
> We believe this study is indicative of the potential power of our data set and could support the future development of products for which we may seek to obtain FDA and other regulatory agency authorization for use in the detection of infant health issues.

103. Even while recognizing the Smart Sock's effectiveness in the "diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease," which aligns with the definition of a medical device under the Act, the Individual Defendants misleadingly maintained that the Smart Sock is not classified as a medical device.

104. The Registration Statement featured financial projections for Owlet,

predicting substantial revenue growth from $75.2 million in 2020 to $1.06 billion by 2025, used to support its valuation of Owlet common stock. However, these projections were based on the Company's reliance on Smart Sock sales for the majority of its revenue and were misleading, as the Registration Statement did not disclose the numerous FDA communications concerning the Smart Sock's regulatory status.

105. Regarding Owlet's regulatory compliance, the Registration Statement claimed that the Company was "in compliance in all material respects with applicable FDA Laws.":

> "Since January 1, 2018, all products developed, tested, investigated, produced, manufactured, labeled, stored, promoted, marketed, imported, exported, distributed, or sold by or on behalf of the Group Companies have been, or are being, developed, tested, investigated, produced, manufactured, labeled, distributed, stored, promoted, marketed, imported, exported, distributed and sold in compliance in all material respects with applicable FDA Laws.
>
> * * *
>
> [T]he Company holds all material permits, including 501(k) clearances or premarket approvals required by applicable FDA Laws."

106. Further, the Registration Statement expressly stated that "to [Owlet's] knowledge*, **no Government Entity is considering . . . changing the marketing classification . . . of any of the Company Products in any material respect."***

107. The Registration Statement falsely claimed that the Company had "***not received any written notice or communication from any Governmental Entity . . . alleging or asserting material noncompliance with any applicable FDA Law, any***

***warning or untitled letter*** . . . or similar written letter or notice alleging noncompliance."

108. The Registration Statement further falsely asserted that "there are no facts or circumstances reasonably likely to cause … a termination, seizure or suspension of the marketing or distribution … of any such product[.]"

109. The Proxy Statement, filed with the SEC on June 21, 2021, reiterated the supposed warnings from the preliminary Proxy Statement, stating that regulatory agencies might disagree with the Company's characterization of the Smart Sock and could require authorization:

> ***If the FDA or any other governmental authority were to require clearance, approval, certification or other form of marketing authorization for the Owlet Smart Sock, or for any other product that we sell and which we do not believe requires such clearance, approval, certification or marketing authorization, we could be required to cease selling or recall the product pending receipt of such clearance, approval, certification or marketing authorization from the FDA or such other governmental authority, which can be a lengthy and time-consuming process, and we may also be subject to regulatory enforcement action.***
>
> We currently sell the Owlet Smart Sock, which we market for use by parents of healthy babies to provide peace of mind, and for which we have not sought or obtained any marketing authorization from the FDA or similar authorization, approval, or certification from any other governmental authority. In response to inquiries from the FDA and regulatory authorities in other jurisdictions regarding the marketing of the Owlet Smart Sock, we have communicated our belief that the Owlet Smart Sock is not a medical device and does not require marketing authorization from the FDA or approval/certification from such

other regulatory authorities. ***However, the FDA and/or certain regulatory authorities have expressed they do not agree with that conclusion and could require us to obtain marketing authorization (or approval/certification) to continue to sell the product. For example, the Medicines and Healthcare products Regulatory Agency, the regulatory authority responsible for the UK medical device market, has asserted that the Owlet Smart Sock requires (CE mark) certification and subsequent registration as a medical device in the UK, but has indicated they will allow us to continue to market the Owlet Smart Sock until May 2022 without such certification or registration***. Obtaining authorization to sell the Owlet Smart Sock as a medical device is a time-consuming and costly process and we may be precluded from selling the Owlet Smart Sock if we are required to obtain marketing authorization. If granted, a marketing authorization could require conditions to sale, for example, a prescription requirement. ***If the FDA or other regulatory authorities require such marketing authorization (or approval/certification, respectively) for the Owlet Smart Sock, or for any other product that we sell and which we do not believe requires such clearance, approval, certification or marketing authorization, we could be required to cease selling or recall the product in the corresponding jurisdiction pending receipt of marketing authorization (or approval/certification)***, which can be a lengthy and time-consuming process, and we may also be subject to regulatory enforcement action. In addition, we may be required to modify the product's functionality or limit our marketing claims for the product, whether or not we obtain such clearance, approval, certification or marketing authorization. In any such event, our business could be substantially harmed."

110. It was materially misleading to state that "the FDA and/or certain regulatory authorities have expressed they do not agree" with the Company's

classification of the Smart Sock, while only mentioning the Medicines and Healthcare products Regulatory Agency as the regulatory body that had raised concerns. In fact, the FDA had also clearly communicated to the Company that the Smart Sock was classified as a medical device.

111. The Proxy Statement also repeated the same misleading claim from the preliminary Proxy Statement regarding the tachyarrhythmia study, reaffirming that, despite its diagnostic capability, "the Owlet Sock is a consumer product and not a medical device."

112. The Proxy Statement also contained the misleading financial projections from the preliminary Proxy Statement, while omitting the likelihood that the Company would be required to halt marketing and distribution of the Smart Sock until obtaining FDA authorization. Regarding the Company's revenue growth, the Proxy Statement stated:

> Revenues increased by $7.0 million, or 47.3%, from $14.9 million for the three months ended March 31, 2020 to $21.9 million for the three months ended March 31, 2021. The increase was primarily due to a 40% increase in sales volume. The increase was primarily driven by substantial sales growth for the Owlet Sock. Owlet Smart Sock sales to retailers and consumers for the Owlet Smart Sock increased 54% and 25%, respectively, from the three months ended March 31, 2020 to the three months ended March 31, 2021.

113. The statement was materially false and misleading as it failed to reveal the substantial risk that the Company could lose future revenue from Smart Sock sales if forced to stop marketing and distributing the product until obtaining FDA authorization.

114. Regarding Owlet's regulatory compliance, the Proxy Statement asserted that the Company was in compliance with applicable FDA Laws:

Since January 1, 2018, all products developed, tested, investigated, produced, manufactured, labeled, stored, promoted, marketed, imported, exported, distributed, or sold by or on behalf of the Group Companies have been, or are being, developed, tested, investigated, produced, manufactured, labeled, distributed, stored, promoted, marketed, imported, exported, distributed and sold in compliance in all material respects with applicable FDA Laws.

* * *

[T]he Company holds all material permits, including 501(k) clearances or premarket approvals required by applicable FDA Laws."

115. The above statements were false and misleading due to the Defendants' failure to disclose material negative details regarding the Company's operations, business, and future outlook. Among other things, Defendants misrepresented or omitted that: (1) that the FDA had communicated to Owlet since 2016 that the Smart Sock qualified as a medical device under the Act; (2) that the FDA would therefore require Owlet to obtain marketing authorization; (3) that Owlet would have to cease commercial distribution of the Smart Sock in the U.S. until it obtained the requisite approval; and (4) therefore, the Company's communications to the public were substantially misleading throughout the relevant times.

## THE TRUTH EMERGES

116. On October 4, 2021, the Company disclosed that it had received an FDA Warning Letter on October 1, 2021.

117. The FDA issues Warning Letters "only for violations of regulatory significance. Significant violations are those violations that may lead to enforcement action if not promptly and adequately corrected."

118. The Warning Letter stated the following:

> The United States Food and Drug Administration (FDA) has learned ***that your firm is marketing Owlet Smart Socks in the United States without marketing clearance or approval, in violation of the Federal Food, Drug, and Cosmetic Act (the Act).***
>
> Under section 201(h) of the Act, 21 U.S.C. §321(h), these products are devices because they are intended for use in the diagnosis of disease or other conditions or in the cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body. Products that measure blood oxygen saturation and pulse rate are devices when they are intended to identify (diagnose) desaturation and bradycardia and provide an alarm to notify users that measurements are outside preset values.
>
> FDA has reviewed your firm's web site, multiple commercial websites, and your firm's responses to FDA correspondence and determined that the Owlet Smart Socks are offered for sale in the United States without marketing approval, clearance, or authorization from FDA. Accordingly, your products are adulterated under section 501(f)(1)(B) of the Act, 21 U.S.C. § 360e(a), or an approved application for an investigational device exemption (IDE) under section 520(g) of the Act, 21 U.S.C. § 360j(g) for the device as described and marketed. The introduction or delivery for introduction of an adulterated or misbranded device into interstate commerce is prohibited under section 301(a) of the Act, 21 U.S.C. § 331(a).

119. The Warning Letter also included a non-exhaustive list of examples where the Company had marketed the Smart Sock as a medical device, in violation of the Act:

- Owlet Sales: https://owletcare.com/
  - "We look at the best indicators of your baby's overall well-being and will proactively notify you if your baby may need you"
  - "Track heart rate, oxygen level, and sleep trends"
- Amazon Web Site: https://www.amazon.com/Owlet Smart Sock 3
  - "Track the most important indicators of your baby's health-like oxygen level, heart rate, and total hours slept"
  - "If your baby's readings leave preset "safe" zone, the Smart Sock will immediately notify you that your baby needs your attention"
- Target Sales: https://www.target.com/p/owlet-smart-sock-3-baby-monitorwith-oxygenheart-rate/-/A-83704325?preselect=79727730#lnk-sametab
  - "Owlet Smart Sock 3 Baby Monitor with Oxygen & Heart Rate"
  - "Tracks the baby's heart rate and oxygen level"
  - "Tells you when Baby needs you"
  - "Measures how long and how well the baby slept"
- Walmart Sales: https://www.walmart.com/ip/Owlet-Smart-Sock-Baby-Monitor/167836816
  - "Owlet Smart Sock 2 Baby Monitor, Tracks Heart Rate & Oxygen"
  - "Rest easy knowing you'll receive proactive notifications via lights and sounds if your baby's oxygen level or heart rate leave preset zones"
  - "View real-time heart rate and oxygen level and receive notifications from any connected device using the Owlet app"

120. The FDA Warning Letter also disclosed that the FDA had been in communication with the Company since 2016 regarding the regulatory status of the Smart Sock:

"Since 2016, the FDA has corresponded with Owlet that the Owlet Smart Sock

meets the definition of a device under the FD&C Act and does not fall under the compliance policy for low-risk products that promote a healthy lifestyle (General Wellness guidance)."

121. As a result of the Company's non-compliance with FDA regulations, the FDA directed Owlet to cease marketing and distribution of the Smart Sock:

> Our office requests that Owlet Baby Care, Inc. cease any activities that result in the adulteration of the Owlet Smart Sock (All versions and co-branded products), such as the commercial distribution of the device for the uses discussed above.
>
> Your firm should take prompt action to address any violations identified in this letter. Failure to adequately address this matter may result in regulatory action being initiated by the FDA, including, but not limited to, seizure, injunction, and civil money penalties.
>
> Other federal agencies may take your compliance with the FD&C Act and its implementing regulations into account when considering the award of federal contracts.

122. Following this news, the Company's stock price dropped by 23%, closing at $4.19 per share on October 4, 2021.

123. On October 25, 2021, the Company announced that, as of October 22, 2021, it had halted distribution of the Smart Sock in accordance with the FDA's Warning Letter.

124. During the earnings call on November 10, 2021, hosted by the Company, Defendant Scolnick acknowledged that the FDA's Warning Letter and the subsequent halt in all Smart Sock sales had already affected the Company, stating:

> As we head into Q4 2021, the domestic regulatory factors we are working through for Smart Sock products are creating near-term headwinds for our product sales growth trajectory in the U.S.

125. During an earnings call on March 7, 2022, hosted by the Company, Defendant Scolnick stated:

> As a result, for the fourth quarter and year ended 2021, the company recorded a contra revenue adjustment of $23.2 million for received and anticipated returns on the Owlet Smart Sock and Owlet monitor duo products.
>
> * * *
>
> The cessation of US Smart Sock and Duo sales and product returns however, resulted in total net negative revenues of $2.5 million for the fourth quarter 2021.

126. The Company's annual report for the 2021 fiscal year emphasized that its financial performance had been severely impacted by the FDA's Warning Letter:

> The Company’s results of operations for the fourth quarter and year-ended 2021 were substantially and negatively impacted due to the reduction of revenues for received and anticipated returns of Owlet Smart Sock and Owlet Monitor Duo product. For the quarter and year ended December 31, 2021, the Company recorded contra-revenue of $23.2 million and accrued returns of $20.1 million as of December 31, 2021.

127. On May 11, 2022, the Company announced its first quarter 2022 results, indicating it was still dealing with the aftermath of the FDA's Warning Letter. The Company reported a net loss of $0.26 per share, falling short of expectations by $0.11, and flat year-over-year revenue of $21.5 million.

128. Over a year after receiving the Warning Letter, during Owlet's 3Q2022 earnings call on November 14, 2022, Defendant Workman disclosed that Owlet had only "recently aligned" with the FDA on a strategy for clearance for the Smart Sock, stating:

> After multiple meetings with the FDA over the past 12 months regarding our Sock technology, we have recently aligned with FDA to submit a de novo application that will include both the display of heart rate and oxygen currently in the Dream Sock and additional opportunistic notification features as a software as a medical device. . . . We've completed a broad range of clinical studies to support these submissions and to further validate the accuracy and safety of our product.

129. About seven months later, on June 20, 2023 Owlet announced in a press release that it had received clearance from the FDA to market its prescription monitor, BabySat.

130. Nearly a year later, on November 9, 2023, Owlet announced "De Novo clearance" from the FDA for its Dream Sock product in an article titled *Owlet Achieves De Novo FDAClearance for Dream Sock—The First and Only Over-the-Counter, Medical Grade Pulse Oximeter Cleared for Infants*. The FDA-cleared Dream Sock, Owlet stated, will now "monitor and display Baby's Live Health Readings, including pulse rate and oxygen saturation level, and will provide Health Notifications, which will alert caregivers with lights and alarm sounds if their infant's readings fall outside of preset ranges."

## <u>THE SECURITIES CLASS ACTION</u>

131. On November 17, 2021, a Securities Class Action was filed against the Company and certain Individual Defendants in the United States District Court for the Central District of California, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. Subsequently, on November 30, 2021, a

separate securities class action was filed in the same court, based on the same underlying facts, captioned *Jones Cherian v. Owlet, Inc. et al*, Case No. 2:21-cv-09293-FLA-JEM (the "Cherian Class Action").

132. On September 29, 2022, the Securities Class Action and the Cherian Class Action were consolidated, and the Amended Complaint was filed on December 22, 2023.

133. On August 5, 2024, the court in the Securities Class Action denied the defendants' motion to dismiss. The court concluded, among other findings, that the Amended Complaint sufficiently alleges that the defendants made statements that "were materially false or misleading."

134. Specifically, the court found that the plaintiff in the Securities Class Action "allege[d] sufficiently" that the individual defendants in that action "misrepresented they never received written communication from the FDA alleging non-compliance" and that "Owlet was sufficiently on notice that the FDA expected Owlet to obtain agency approval prior to the sale and distribution of the Smart Sock."

135. On September 26, 2024, the court in the Securities Class Action granted in part the defendants' motion for reconsideration. The court held that claims based on pre-merger statements were dismissed, but that claims based upon post-merger statement may move forward. The court elaborated that statements made in the Registration Statement were incorporated into the August 5, 2021 Registration Statement Form S-1.

**<u>SUMMARY OF THE INDIVIDUAL DEFENDANTS WRONGFUL CONDUCT</u>**

136. The Individual Defendants breached their fiduciary duties because they allowed or permitted the Company to disseminate false and misleading statements. Additionally, the Company's SEC filings and omissions caused the above-discussed internal failures caused or allowed the illicit activity described in this Complaint.

137. The Individual Defendants breached their fiduciary duties because they failed to maintain an adequate system of oversight, disclosure controls, and procedures.

138. The Individual Defendants breached their fiduciary duties to Owlet because they willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact regarding, at least, Forms 8-K, Proxy, press releases, soliciting materials described in this complaint. Defendants signed and authorized the SEC filings that were false and misleading because the Defendants falsely stated/or failed to disclose the following on their watch that: (1) that Owlet was reasonably likely to be required to obtain marketing authorization for the Smart Sock because the FDA concluded it was a medical device; (2) that, as a result, Owlet was reasonably likely to cease commercial distribution of the Smart Sock in the U.S. until it obtained the requisite approval; and (3) therefore, the Company's communications to the public were substantially misleading throughout the relevant times.

## DAMAGES TO OWLET

139. As a direct and proximate result of the Individual Defendants' conduct, Owlet will lose and expend many millions of dollars.

140. Such expenditures include, but are not limited to, legal fees associated with the federal securities lawsuit filed against the Company, its CEO, and CFO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

141. Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

142. As a direct and proximate result of the Director Defendants' conduct, Owlet has also suffered and will continue to suffer a loss of reputation and goodwill,

and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Director Defendants' breaches of fiduciary duties.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

143. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Individual Defendants.

144. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and have retained counsel competent and experienced in derivative litigation.

145. Plaintiff is a current owner of the Company stock and has continuously owned Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

146. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

147. During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Individual Defendants.

148. Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act, and Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action.

149. At the time this action was commenced, the eight-member Board was comprised of Defendants Susan, Durr, McCullough, Burke, Kim, Workman, Gonzales, and Stoll (the "Director Defendants"). Thus, Plaintiff is only required to show that a majority of the Defendants, i.e., four, cannot exercise independent objective judgment about whether to bring this action or whether to vigorously

prosecute this action. As detailed below, all current members of the Board are unable to make an independent and impartial decision to initiate and aggressively pursue this action, in part because they face a substantial likelihood of liability. Therefore, a demand on the Board to pursue this action is not required, as such a demand would have been futile.

150. Each of the Directors approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

151. Each of the Directors authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

152. Furthermore, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the clear issues with the Company's internal controls, practices, and procedures, and they failed to make a good faith effort to address or prevent the recurrence of these problems.

**Defendant Workman**

153. Defendant Worman is not disinterested or independent, and therefore, is incapable of considering demand because, during the Relevant Period, Workman co-founded the Company and served as its CEO. Further, Defendant Workman is named as a defendant, and faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein.

**Defendant Susan**

154. Defendant Susan is not disinterested or independent, and therefore, is incapable of considering demand because during the Relevant Period, Susan served as the Chairman of the Board and is the Company's majority shareholder. Defendant Susan is the founder and Managing Partner of Eclipse Ventures, LLC ("Eclipse"), which beneficially owns 63.38% of the Company's common stock.

**Defendants Durr, McCullough, and Kim**

155. Defendants Durr, McCullough, and Kim are not disinterested or independent, and therefore are incapable of considering demand because, during the Relevant Period, Durr, McCullough, and Kim served on the Company's Audit Committee (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, inter alia, public disclosures, internal controls, and procedures over financial reporting, and the audits of the financial statements. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

156. For these reasons, Durr, McCullough, and Kim breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore excused.

**Defendant Stoll**

157. Defendant Stoll is not disinterested or independent, and therefore, is incapable of considering demand because has been an Investment Partner at Eclipse since February 2023.

158. The Directors, as members of the Board, were and are subject to the Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations. The Code of Conduct requires the Directors to also adhere to the Company's standards of business conduct. The Directors did not comply with the requirements of the Code of Conduct. The Directors violated the Code of Conduct because they knowingly or recklessly engaged in and facilitated the misconduct alleged herein and participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Directors violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

159. Furthermore, demand, in this case, is excused because the Directors, who are named as defendants in this action, control the Company and are indebted to each other. The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand upon the Directors would be futile.

160. Owlet has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein. Yet, the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Owlet any part of the damages Owlet suffered and will continue to suffer, thereby. Thus, any demand to the Directors would be futile.

161. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of

the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

162. The acts complained of herein constitute violations of fiduciary duties owed by Owlet's officers and directors, and these acts are incapable of ratification.

163. The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of Owlet. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Owlet, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

164. If there is no directors' and officers' liability insurance, then the Directors will not cause Owlet to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well. Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least five of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon

the Board is excused as futile.

## CLAIMS FOR RELIEF

### COUNT 1

### Breach of Fiduciary Duty Against the Individual Defendants

165. Plaintiff incorporates by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

166. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Owlet's business and affairs.

167. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision. The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Owlet's shareholders.

168. In breach of their fiduciary duties owed to Owlet, the Individual Defendants willfully or recklessly caused the Company to violate federal regulations by falsely stating and/or failing to disclose the Company's true business performance, as alleged herein.

169. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct those public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth, in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material

misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Owlet's securities.

170. The Individual Defendants had actual or constructive knowledge that they had caused the Company to engage in the fraudulent schemes set forth herein improperly and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to engage in the fraudulent schemes improperly and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Owlet's securities.

171. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

172. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Owlet has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

173. Plaintiff, on behalf of Owlet, has no adequate remedy at law.

## COUNT II
## Violations of Section 14(a) of the Exchange Act Against the Director Defendants

174. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

175. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that,

> [i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities

exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

176. Rule 14a-9, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

177. Under the direction and watch of the Director Defendants, the Company made materially misleading statements in its Proxy Statements filed with the SEC on June 21, 2021, May 2, 2022, and May 1, 2023 (collectively, the "Proxies") concerning the regulatory status of the Company's flagship Sock products, from which Owlet derived the majority of its revenues.

178. The Director Defendants knew or should have known that by misrepresenting and/or failing to disclose the foregoing material facts, statements contained in the Proxies were materially false and misleading.

179. The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the Proxies.

180. Plaintiff has no adequate remedy at law.

**COUNT III**

**Unjust Enrichment**
**Against the Individual Defendants**

181. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

182. By their wrongful acts, violations of law, and false and misleading statements and omissions of material information, the fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of Owlet.

183. Each of the Defendants received payment from Owlet, in the form of either salary or director fees while actively breaching their fiduciary duties to Owlet.

184. All the payments and benefits provided to defendants were at the expense of Owlet. The Company received no benefit from these payments.

185. Plaintiff, as a shareholder and a representative of Owlet, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

186. Plaintiff, on behalf of Owlet, has no adequate remedy at law.

**COUNT IV**
**Waste of Corporate Assets**
**Against the Individual Defendants**

187. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

188. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Owlet to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors and customers who no longer trust the Company.

189. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

190. Plaintiff, on behalf of Owlet, has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

a) Declaring that the Plaintiff may maintain this action on behalf of Owlet, and that Plaintiff is an adequate representative of the Company;

b) Declaring that the Individual Defendants have breached their fiduciary duties to Owlet;

c) Determining and awarding to Owlet the damages sustained, or disgorgement or restitution, by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

d) Directing the Individual Defendants to take all necessary actions to reform and improve Owlet's corporate governance and internal procedures to comply with applicable laws and to protect Owlet and its shareholders from a repeat of the damaging events described herein;

e) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

f) Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Date: October 3, 2024

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By: /s/ Alex J. Tramontano
ALEX J. TRAMONTANO

BETSY C. MANIFOLD
RACHELE R. BYRD

750 B Street, Suite 1820
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com

JUSTIN A. KUEHN
**KUEHN LAW, PLLC**
53 Hill Street, Suite 605
Southampton, NY 11968
Telephone: (833) 672-0814
justin@kuehn.law

*Attorneys for Plaintiff*

**VERIFICATION**

I, Nathan Capleton, have reviewed the allegations made in this Verified Stockholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of Owlet, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 1st day of October 2024.

NATHAN CAPLETON